1
2
3
4
5
6
7
8
9
10

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RAUL ARELLANO,<br>CDCR #AH-1995,<br><br>                                   Plaintiff,<br><br>vs.<br><br>JONES, LVN Nurse; SIHOTANG, LVN<br>Nurse; DR. MARTIN; SANTILLAN,<br>LVN; CDCR;<br><br>                                   Defendants. | Case No.:  3:20-cv-00228-RBM-LR<br><br>**ORDER:**<br><br>**(1) GRANTING DEFENDANTS'<br>MOTION FOR SUMMARY<br>JUDGMENT PURSUANT TO Fed. R.<br>Civ. P. 56; AND**<br><br>**(2) SUA SPONTE DISMISSING<br>FOURTEENTH AMENDMENT<br>CLAIM PURSUANT TO 28 U.S.C.<br>§ 1915(e)(2) AND § 1915A**<br><br>**[Doc. 53]** |

Plaintiff Raul Arellano ("Plaintiff" or "Arellano"), currently incarcerated at Richard J. Donovan Correctional Facility ("RJD") in San Diego, California, and proceeding pro se, filed this civil rights action pursuant to 42 U.S.C. § 1983, on February 6, 2020.  *See* Compl., Doc. 1.[1]  Arellano claims Defendants, RJD medical personnel, violated his Eighth and

---

[1] Throughout this Order and for ease of consistency and reference, the Court will cite to each document in the record using both the number assigned to the document and the page number automatically generated by its Case Management/Electronic Case File system.

1

Fourteenth Amendment rights, along with violations of state law claims, by failing to provide him with adequate medical care.  *See generally id.*

## I. Procedural History

Defendants R. Santillan, B. Martin, O. Sihotang, and F. Jones have filed a Motion for Summary Judgment pursuant to Fed. R. Civ. P. 56.  *See* Doc. 53.  The Court has provided Arellano with notice of the requirements for opposing summary judgment as required by *Klingele v. Eikenberry*, 849 F.2d 409 (9th Cir. 1988) and *Rand v. Rowland,* 154 F.3d 952 (9th Cir. 1998) (en banc).  *See* Doc. 55.  After Arellano was granted three extensions of time to file an Opposition, *see* Docs. 57, 61, 63, he filed his Opposition on March 24, 2023.  *See* Doc. 64.

Defendants filed their Reply on April 28, 2023.  *See* Doc. 68.  Arellano later filed a "Motion for Leave to File Sur-Reply" which the Court granted and gave Arellano until June 2, 2023, to file his Sur-Reply.  *See* Docs. 70, 71.  That time passed, and Arellano filed a "Motion for Extension of Time to File a Sur-Reply."  *See* Doc. 73.  The Court again granted Arellano's request and gave him until June 23, 2023 to file his Sur Reply.  *See* Doc. 74.  However, once again, that time has passed and Arellano has not complied with the Court's Order.

Having now carefully considered the full record as submitted, the Court finds Defendants are entitled to judgment as a matter of law with respect to Arellano's Eighth Amendment claims, **GRANTS** Defendants' Motion for Summary Judgment pursuant to Fed. R. Civ. P. 56 (Doc. 53).

## II. Judicial Notice

As an initial matter, the Court takes judicial notice of the several lawsuits Plaintiff has filed previously involving claims that he was not provided with adequate medical care while housed at RJD.  A court may take judicial notice of its own records, *see Molus v. Swan*, No. 3:05-cv-00452-MMA-WMc, 2009 WL 160937, at *2 (S.D. Cal. Jan. 22, 2009) (citing *United States v. Author Servs.*, 804 F.2d 1520, 1523 (9th Cir. 1986)); *Gerritsen v. Warner Bros. Entm't Inc.*, 112 F. Supp. 3d 1011, 1034 (C.D. Cal. 2015), and "'may take

2

notice of proceedings in other courts, both within and without the federal judicial system, if those proceedings have a direct relation to matters at issue.'" *Bias v. Moynihan*, 508 F.3d 1212, 1225 (9th Cir. 2007) (quoting *Bennett v. Medtronic, Inc.*, 285 F.3d 801, 803 n.2 (9th Cir. 2002)); *see also United States ex rel. Robinson Rancheria Citizens Council v. Borneo, Inc.*, 971 F.2d 244, 248 (9th Cir. 1992).

Arellano had filed ten other civil rights actions in the Southern District of California between March 13, 2014, and the filing of this case on February 6, 2020. *See* https://pcl.uscourts.gov/pcl/pages/search/results/parties (last visited June 23, 2023). At least six of these matters contain Eighth Amendment inadequate medical care allegations related to pain medication. *Cf. Arellano v. Hodge, et al.,* S.D. Cal. Civil Case No. 3:14-cv-00590-JLS-JLB; *Arellano v. Sedighi, et al*., S.D. Cal. Civil Case No. 3:15-cv-02059-AJB-BGS; *Arellano v. Melton, et al*., 3:15-cv-02069-JAH-NLS; *Arellano v. Dean, et al*., 3:15-cv-02247-BEN-JLB; *Arellano v. Santos*, 3:18-cv-02391-BTM-WVG (hereinafter "*Santos*"); *Arellano v. Guldseth, et al.*, 3:20-cv-1633-RBM-DDL (hereinafter "*Guldseth*").

In *Guldseth*, Plaintiff's claims included allegations that Dr. Guldseth "improperly discontinued a medication, gabapentin, necessary to control Arellano's seizures and pain." *Guldseth,* Order to Relate Cases, Doc. 5 at 1. United States District Judge Larry Alan Burns found that the claims raised in the action currently before this Court by Arellano involve the allegations that "his seizures and pain increased immediately following Dr. Guldseth's discontinuation of the gabapentin and that he suffered injuries from one such seizure." *Id.* at 2 citing *Arellano v. Jones, et al.*, S.D. Cal. Civil Case No. 3:20-cv-00228-LAB-RBM ("*Jones*"). In *Jones*, Arellano brought claims against Defendants, who were RJD nurses and a doctor, for "among other things, failure to address the symptoms he experienced once he was no longer receiving gabapentin" as ordered by Dr. Guldseth. *Id.* Based on these allegations, District Judge Burns determined that the "two cases involve some of the same parties (Arellano and CDCR), are based on similar claims, and involved

3

the same event" and deemed the cases related.  *Id.*  Therefore, this matter was reassigned to this Court on October 13, 2020 as this Court was also presiding over *Guldseth*.  *See id.*

In *Guldseth*, this Court granted Defendant Dr. Guldseth's Motion for Summary Judgment and found Dr. Guldseth was entitled to summary judgment of Plaintiff's Eighth Amendment claims finding that there was no evidence that Dr. Guldseth was deliberately indifferent to Arellano's serious medical needs when he discontinued Arellano's gabapentin prescription.  *See Guldseth*, Order Granting Defs.' Mtn. for Summ. J., Doc. 74 at 20, 26.

### III.   Defendants' Motion for Summary Judgment

A.   <u>Standard of Review</u>

A court may grant summary judgment when it is demonstrated that there exists no genuine dispute as to any material fact, and that the moving party is entitled to judgment as a matter of law.  *See* FED. R. CIV. P. 56(a); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970).  The party seeking summary judgment bears the initial burden of informing a court of the basis for its motion and of identifying the portions of the declarations, pleadings, and discovery that demonstrate an absence of a genuine dispute of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  A fact is "material" if it might affect the outcome of the suit under the governing law.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–49 (1986).  A dispute is "genuine" as to a material fact if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party.  *See Long v. County of Los Angeles*, 442 F.3d 1178, 1185 (9th Cir. 2006).

Where the moving party will have the burden of proof on an issue at trial, the movant must affirmatively demonstrate that no reasonable trier of fact could find other than for the movant.  *See Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007).  Where the non-moving party will have the burden of proof on an issue at trial, the movant may prevail by presenting evidence that negates an essential element of the non-moving party's claim or by merely pointing out that there is an absence of evidence to support an essential

element of the non-moving party's claim.  *See Nissan Fire & Marine Ins. Co. v. Fritz Companies*, 210 F.3d 1099, 1102–03 (9th Cir. 2000).

If a moving party fails to carry its burden of production, then "the non-moving party has no obligation to produce anything, even if the non-moving party would have the ultimate burden of persuasion." *Id.*  But if the moving party meets its initial burden, the burden then shifts to the opposing party to establish that a genuine dispute as to any material fact actually exists.  *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 586 (1986).  The opposing party cannot "rest upon the mere allegations or denials of [its] pleading but must instead produce evidence that sets forth specific facts showing that there is a genuine issue for trial."  *See Estate of Tucker*, 515 F.3d 1019, 1030 (9th Cir. 2008) (internal quotation marks and citation omitted).

The evidence of the opposing party is to be believed, and all reasonable inferences that may be drawn from the facts placed before a court must be drawn in favor of the opposing party.  *See Stegall v. Citadel Broad, Inc*., 350 F.3d 1061, 1065 (9th Cir. 2003).  However, "[b]ald assertions that genuine issues of material fact exist are insufficient."  *See Galen v. County of Los Angeles*, 477 F.3d 652, 658 (9th Cir. 2007); *see also Day v. Sears Holdings Corp*., No. 11–09068, 2013 WL 1010547, *4 (C.D. Cal. Mar. 13, 2013) ("Conclusory, speculative testimony in affidavits and moving papers is insufficient to raise genuine issues of fact and defeat summary judgment.").  A "motion for summary judgment may not be defeated . . . by evidence that is 'merely colorable' or 'is not significantly probative.'"  *Anderson*, 477 U.S. at 249–50 (citation omitted); *see also Hardage v. CBS Broad. Inc*., 427 F.3d 1177, 1183 (9th Cir. 2006).  If the nonmoving party fails to produce evidence sufficient to create a genuine dispute of material fact, the moving party is entitled to summary judgment.  *See Nissan Fire & Marine*, 210 F.3d at 1103.

/ / /

/ / /

/ / /

/ / /

B.    Arellano's Medical History & Treatment Record[2]

    1.    *Arellano v. Guldseth*, et al.[3]

Arellano claims to suffer from seizures, diabetes, and ongoing chronic pain due to neuropathy and nerve damage caused by an excessive force incident in 2010, a fall from his bunk in 2012, and a suicide attempt in April 2018. *See Guldseth,* Compl., Doc. 1 at 3. The parties did not dispute that Arellano suffers from "diabetic neuropathy and has complained of seizures since 2010, but the type of seizure has not been diagnosed." Defs.' Memo of Ps & As in Supp. of Mtn. for Summ. J. (hereinafter "Defs. Ps & As"), Doc. 49 at 11.

In December of 2015, Arellano's primary care physician Dr. Luu prescribed him Lyrica but due to the side effects Arellano experienced, he later switched him to Gabapentin. Initially, Arellano began receiving 900 mg of Gabapentin per day, along with Depakote[4]. *See* Doc. 49-6 at 2010-2011, Pl.'s Dep. at 43:10-13. Arellano testified that the Gabapentin was prescribed to "get more control of [his] seizures and [his] pain, nerve damage pain." *Id.* at 43:13-15. By September of 2017, Arellano's RJD primary care

---

[2]  For a portion of Arellano's medical history, Defendants have incorporated by reference the facts in the record found in *Guldseth*. *See* Defs.' Memo of Ps & As in Supp. of Mtn. for Summ. J. (hereinafter "Defs. Ps & As"), Doc. 53 at 11. Because the claims in this case relate, in part, to the medical history set forth in *Guldseth*, the Court takes judicial notice of the Order Granting Defendants' Motion for Summary Judgment in *Guldseth* and will summarize the most relevant facts from that Order.

[3] Every citation and reference to the record in this section are from the Court's docket in *Guldseth.*

[4] Depakote® is the brand named for divalproex sodium. It is an "anti-epileptic drug" indicated for "[m]onotherapy and adjunctive therapy of complex partial seizures and simple and complex absence seizures." "Patients treated with [Depakote] for any indication should be monitored for the emergence or worsening of depression, suicidal thoughts or behavior, and/or unusual changes in mood or behavior." *See* https://www.pdr.net/full-prescribing-information/Depakote-Tablets-divalproex-sodium-1075 (last visited Mar. 23, 2023.)

physicians increased his Gabapentin dose to 900 milligrams three times a day. *See id.* at 2012, Pl.'s Dep. at 44:11-13. When his Gabapentin dosage was increased to 2700 milligrams a day in 2017, Arellano believed that his "partial seizures were basically almost gone" and his pain was "less severe." *Id.* at 2014, Pl.'s Dep. at 46:22-25 to 47:1-2.

However, two months later, in November of 2017, Arellano was seen by Dr. Messler and Arellano informed her that he was in a "severe level of pain." *Id.* at 2012, Pl.'s Dep. at 44:15-20. Dr. Messler ordered an "EMG[5] and x-rays" which "came back normal." *Id.* at 44:19-22. Arellano testified that when he was taking 2700 milligrams of Gabapentin his "partial seizures were basically almost gone." *Id.* at 2014, 46:21-23.

However, in January of 2018, Arellano reported that his "chronic pain had increased" and the "effectiveness of the pain medication had decreased." *Id.* at 2016; 48:8-9; 48:14-16. In February of 2018, Arellano reported that he was experiencing "pain and seizures" and his pain was at "level 10." *Id.* at 2017; 49:17-20. In addition, Arellano was "losing balance and having bladder problems," and as a result, he sought an increase in the dosage of Gabapentin he was receiving. *Id.*

In March of 2018, Dr. Santos became Arellano's primary care physician. *Id.* at 2020; 52:18-25. During this same time frame, Arellano was placed in a mental health crisis bed for approximately thirty days for attempting suicide. *Id.* at 2023; 50:7-10. However, Arellano attests that he was "discharged too soon" because he was still in "intense pain." *Id.* at 2024; 56:14-17. Arellano saw Dr. Santos for the first time on May 7, 2018. *See id.* at 56:24-25.

On June 14, 2018, Dr. Santos reduced Arellano's Gabapentin prescription from 2700 milligrams per day to 2400 milligrams per day. *See id*. at 2028; 61:1-7. Arellano found this to be "unreasonable" and he "got mad." *Id.* In October of 2018, Arellano filed a civil

---

[5] EMG is an acronym for electromyography which is a test that "measures the electrical activity of muscles and nerves." *See* https://medlineplus.gov/lab-tests/electromyography-emg-and-nerve-conduction-studies/ (Last visited Apr. 13, 2023.)

rights action against Dr. Santos, in part alleging that Dr. Santos violated his Eighth Amendment rights when he tapered Arellano's dosage of Gabapentin.  *See generally Arellano v. Santos,* S.D. Cal. Civil Case No. 3:18-cv-02391-BTM-WVG, Doc. 1, Compl. In this matter, District Judge Barry Ted Moskowitz found that the "medical records before the Court, offered both by Dr. Santos in support [of Dr. Santos' Motion for Summary Judgment] and by Arellano in opposition, establish that the medications and overall course of treatment Dr. Santos provided to Arellano from March 2018 through October 2018 was medically appropriate under the circumstances." *Id*., Doc. 91, Order Granting Defendant's Motion for Summary Judgment at 25.

On December 12, 2018, Dr. Guldseth became Arellano's primary care physician. *See Guldseth* Decl., Doc. 49-3 at ¶ 2.  At this time, Arellano was "prescribed 1800 mg of Gabapentin, 1950 mg of acetaminophen, and 1000 mg naproxen daily to address his complaints of neuropathic pain." *Id.* at ¶ 3.  Arellano continued to complain of "intense pain" that was preventing him from eating and sleeping.  *See* Doc. 49-6 at 2110-11; 48:12 – 49:1.

Dr. Guldseth examined Arellano for the first time on January 3, 2019.  *See* Guldseth Decl., Doc. 49-3 at ¶ 4.  Dr. Guldseth attests that he raised with Arellano his purported refusal to submit to having lab work done on December 28, 2018 "intended to measure the Gabapentin levels" in his bloodstream for an upcoming "elective hernia repair surgery." *Id.*  However, Arellano informed Dr. Guldseth that he had "completed his labs" that morning.  *Id.*

One week later, Dr. Guldseth saw Arellano on January 10, 2019.  *Id.* at ¶ 5.  He determined that Arellano was still taking his prescribed medication, but Dr. Guldseth advised Arellano to temporarily stop taking naproxen in preparation for his upcoming hernia surgery.  *Id.*  He explained to Arellano that this is a common practice in the medical community to temporarily stop all "non-steroid anti-inflammatory medications" before surgery to prevent excessive bleeding.  *Id.*  In response, Arellano sought to increase his Gabapentin "due to nighttime pain" but Dr. Guldseth refused.  *Id.*  In Dr. Guldseth's

opinion, Arellano's practice of taking "several doses of Gabapentin before a blood draw" would indicate "abuse of medication" and a review of his medical history indicates that even when Arellano had been prescribed 2700 milligrams of Gabapentin daily, he still had "severe complaints of pain" which indicates that the medication was ineffective. *Id.*

Arellano disputes this and testified that he was having blood drawn every week and he had no knowledge that purpose of these blood draws were to determine the levels of Gabapentin. *See* Doc. 49-6 at 2104; 14:18-23. One day, Arellano "went to the line" but they would not give him the Gabapentin. *Id.* at 2104-05; 14:25 -15:1-2. Arellano went to speak to Dr. Guldseth who told him that he discontinued his prescription because he missed his weekly blood draw. *See id.* at 2105; 15:3-6.

Dr. Guldseth attests that he examined Arellano on January 30, 2019 in response to Arellano's healthcare requests where he indicated that he was suffering from "severe pain triggering seizures" and he had fallen down some stairs. Guldseth Decl., Doc. 49-3 at ¶ 6. Dr. Guldseth learned that Arellano had declined the hernia surgery. *See id.* They discussed his medication and Arellano "reported the Naproxen and Depakote was helpful but he wanted 2700 mg of Gabapentin." *Id.* Dr. Guldseth told Arellano to report to the "Triage and Treatment Area (TTA)" because Arellano's seizures were "unwitnessed" and a "prolactin test done shortly thereafter could confirm that a seizure occurred." *Id.* Dr. Guldseth was willing to "titrate his Gabapentin dosage up to 2700 mg because recent records demonstrated compliance" but he told Arellano that he would discontinue this medication if he "was not compliant with his medications or refused to submit for lab work." *Id.*

On February 1, 2019, it was documented that Arellano refused to submit to a "Gabapentin level" blood draw. *See* Doc. 49-6 at 1189, Progress Notes dated Feb. 1, 2019. As a result, Arellano's Gabapentin dosage was reverted back to 1800 milligrams pursuant to the "previous agreement" with Dr. Guldseth that if he was not "compliant with levels labs and agreed upon plan, Gabapentin dose would be decreased." *Id.* Arellano maintains that he did not refuse to have his blood drawn on this day, instead he claims he did not

9

show up for his appointment because he was being seen by the neurologist instead causing him to miss the time he was supposed to be at the lab. *See* Pl.'s Opp'n to MSJ ("Opp'n"), Doc. 66 at 4-5.

Arellano was seen by Neurologist, Chandler P. Malhotra ("hereinafter Dr. Malhotra") on February 1, 2019. *See* Doc. 49-6 at 571, Progress Record dated Feb. 1, 2019. Dr. Malhotra recommended that Arellano have an EMG for both of his legs for "assessment of neuropathy." *Id.* at 573. Following those tests, Arellano was to return to Dr. Malholtra for a "face [to] face" evaluation. *Id.* Dr. Malholtra did not make any recommendations with regard to medication. *See* Guldseth Decl., Doc. 49-3 at ¶ 8.

Arellano then submitted "requests for healthcare services on February 3 and 5 stating he wanted 2700 mg of Gabapentin, custody staff caused him to be non-compliant and the Depakote should be discontinued because of stomach pain, dark urine, confusion, tiredness, nausea, vomiting, increase in depression, panic attacks, anxiety, trouble sleeping, drowsiness, blurred vision, balance issues, headaches, weakness, mouth sores, hives, difficulty breathing, irritability, and restlessness." *Id.* at ¶ 9; Doc. 49-6 at 528-529, (Health Care Services Request form dated Feb. 3, 2019); Doc. 49-6 at 546, (Health Care Services Request form dated Feb. 5, 2019).

Dr. Guldseth attests that he was concerned that Arellano was "either abusing or diverting Gabapentin" and ordered "weekly lab tests to monitor [Arellano's] compliance." Guldseth Decl., at ¶ 13. He further told Arellano that if he continued to fail to comply with the blood draws, Dr. Guldseth would "taper the Gabapentin prescription." *Id.*

Dr. Guldseth next examined Arellano on March 26, 2019, in response to Arellano filing a grievance requesting that the "Depakote to be discontinued and Gabapentin to be increased." *Id*. at ¶ 15. Dr. Guldseth informed Arellano that he would wait for the results from his EMG and a follow up with Dr. Malholtra "before changing medications." *Id.* Dr. Guldseth agreed to taper Arellano's Depakote prescription, but his Gabapentin prescription remained the same. *See id.*

/ / /

10

However, the following day on March 27, 2019, Arellano filed another grievance claiming he had seizures on March 1, 5, 16, and 27 and again sought an increase in his Gabapentin to 2700 milligrams.  *See* Doc. 49-6 at 525, Healthcare Services Request Form dated Mar. 27, 2019.

Arellano had an EMG on his "upper extremities" on April 23, 2019, but refused to allow the test to be performed on his "lower extremities" and thus, the study was "incomplete" but did not "demonstrate any evidence of carpal tunnel syndrome or sensory neuropathy."  *Id.* at 570, Electromyography and Nerve Conduction Study report prepared by Dr. Malhotra.

Arellano was seen by Dr. Guldseth on May 2, 2019, and Dr. Guldseth noted that Arellano reported having a "seizure most recently 2 nights ago" which was purportedly witnessed by his cellmate but he did not seek medical treatment.  Guldseth Decl. at ¶ 19. Doc. 49-6 at 1184-85, Progress Notes dated May 2, 2019.  Dr. Guldseth "performed a review of symptoms" and indicated that "[n]eurology follow up is scheduled and would like recommendations if seizure medications are indicated at this point or if Gabapentin is indicated based on normal EMG results (though incomplete)."  *Id.* ¶ 19, 1186.

On June 3, 2019, Arellano purportedly refused his "Gabapentin drug test."  Doc. 49-6 at 1182, Progress Notes dated June 3, 2019.  Based on his third missed blood draw, Dr. Guldseth decided to discontinue Arellano's Gabapentin and ordered that it be tapered off over a period of two weeks.  *See* Guldseth Decl. at ¶ 22. Dr. Guldseth attests he made this medical decision based on a number of factors.  *See id.*  First, his decision was based on Arellano's history of drug abuse and Gabapentin's "potential to be a habit-forming addictive medication."  *Id.*  Second, Gabapentin is a "drug prone to diversion" in the correctional setting and Arellano's failure to comply with lab testing, his comments regarding the cost of morphine on the yard, and a threat to sue a nurse if she did not increase his prescription "are all signs of diversion."  *Id.*  Third, Arellano had "ongoing complaints of alleged vision loss" which could be "complicated by Gabapentin" as the side effects of Gabapentin include "dizziness, ataxia, nystagmus, somnolence, and amnesia."  *Id.*  Finally,

it was "not clear that Mr. Arellano benefited from Gabapentin" as his partial EMG "did not indicate neuropathy, for which Gabapentin is clinically indicated." *Id.*

    2. *Arellano v. Jones, et al.*[6]

  On June 4, 2019, the day following Dr. Guldseth's decision to discontinue Arellano's Gabapentin prescription, Arellano missed his morning dose of Gabapentin. *See* Defs. Ex. in Supp. Mtn. Summ. J. (hereinafter "Defs.' Ex."), Doc. 53-7 at 200, Medication Administration Record ("Per pill line officer, HU cell door opened however IP refused to come out.") Arellano submitted a health care services request form that same day claiming that his "pain is so severe it feels like needles" and he is putting RJD officials on notice that his "seizures are control[led] by Gabapentin" and the stopping of this medication is "putting [his] life in danger." *Id.* at 522 (Health Care Services Request Form dated June 4, 2019.)

  On June 5, 2019, Arellano submitted another health care services request form claiming that he missed his lab testing required in order to receive Gabapentin because he "never received any notice of lab testing." *Id.* at 521 (Health Care Services Request Form dated June 5, 2019.) He further indicated that he went to the Triage and Treatment Area ("TTA") the previous day due to "severe pain" because he was concerned that the pain would trigger more seizures and he believes that only Gabapentin can control his seizures. *See id.*

  On that same day, Arellano was transported to the urgent care and his "chief complaint" was noted as complaining of severe pain that felt like "needles that interferes with breathing" and seizure issues. *See id.* at 1513 (Assessment form dated June 5, 2019.) Arellano also complained of "chest pain." *Id.* Arellano was examined by Defendant Dr. Martin who noted that Arellano informed him that he had "head trauma in 2010" which causes him to "get shooting pain in the back of [his] head." *Id.* at 1197 (Progress Notes

---

[6] This factual summary will cite to the record in this matter, *Arellano v. Jones, et al.*, S.D. Cal. Civil Case No. 3:20-cv-0228-RBM-LR.

dated June 5, 2019.) Arellano further told Dr. Martin that his Gabapentin was being tapered off which is causing "more pain, it's an emergency." *Id.* However, after conducting an exam, Dr. Martin wrote "clinical findings did not support an emergency medical condition at this time and the disposition is to return to housing." *Id.* at 1198-99. Dr. Martin further wrote that "[d]uring the medical decision-making process, I have considered [] differential diagnoses including, but not limited to: malingering, musculoskeletal or psychological manifestations of anxiety and/or withdrawal." *Id.* at 1199. Arellano was instructed to see his primary care physician ("PCP") "to have the treatment plan discussed with him." *Id.* Dr. Martin was not Arellano's PCP, his PCP during this timeframe was Dr. Guldseth. *See id.* at 2121, Pl.'s Depo. at 33:21-23.

Arellano attests that Dr. Martin told him during this examination that he was "bullshitting." *Id.* at 2122, Pl.'s Depo. at 34:17. He further attests that Dr. Martin "twisted [his] neck left to right" causing him pain and told him he was just like every other "Hispanic or Mexican" inmate who is "basically making up stuff trying to get pain medication to get high." *Id.* at 34:21-25. Because Arellano told him that he had pain in the back of his head, Dr. Martin "performed a physical exam which included by was not limited to inspection and palpation [of] Mr. Arellano's neck looking for signs of trauma, infection, or other concern." Martin Decl., Doc. 53-2 at ¶ 8. However, Dr. Martin determined that Arellano's neck examination was "unremarkable." *Id.* Accordingly, Dr. Martin determined that "[p]ursuant to CCHCS policy and standards commonly followed in the medical community, it would not have been appropriate to deviate from Dr. Guldseth's plan of care by reinstating Arellano's Gabapentin prescription at an emergency medical appointment like the one on June 5." *Id.* at ¶ 9.

Two days later, Arellano was examined by Dr. Guldseth. *See* Doc. 53-7 at 917. Dr. Guldseth noted that Arellano "reports recurring seizures that were unwitnessed" and requested that his Gabapentin "be increased to 2700mg daily to address" these seizures. *Id.* at 920. Dr. Guldseth referred Arellano to "Neurology for follow up [with] Dr. Malhotra" and opted to continue with the taper of the Gabapentin. *Id.* at 1188.

On June 9, Arellano submitted a request for health care services claiming that the tapering of Gabapentin ordered by Dr. Guldseth resulted in "severe" pain which resulted in chest pain and difficulty breathing.  *See* Doc. 53-7 at 536 (Health Care Services Request Form dated June 9, 2019.)  He also claims that he needs an increased dosage of Gabapentin "to control pain/seizure."  *Id.*  The following day, on June 10, he filed a second request claiming that he had a seizure in his cell and seeking an increase in his Gabapentin dosage because it is the only medication that is "effective" in treating his seizures "without severe side effects."  *Id.* at 519 (Health Care Services Request Form dated June 10, 2019.)

Arellano was seen in the TTA by Nurse Beltran[7] on June 11, 2019 at approximately noon.  *See* Doc. 1497-1512 (Assessment Forms dated June 11, 2019.)  In this form, Nurse Beltran documents that Arellano "presented to clinic smiling, laughing [and] telling jokes" and admitted "noncompliance with Prozac [and] Cymbalta but offered no explanation for his noncompliance."  *Id.* at 1503.  Beltran also noted that Arellano complained of "severe pain" that interfered with his breathing and claimed that his "seizure issues" were the result of the "reduction of Gabapentin."  *Id.* at 1513.  Beltran informed Arellano that he should take "his ordered Acetaminophen and his Capsaicin Cream for his pain" and returned him to his housing unit.  *Id.* at 1512.

Arellano alleges that later that night, at 9:00 p.m., he went to the medical clinic in his yard and told Defendant Licensed Vocational Nurse Jones that he had recently been taken off his "seizure and neuropathy pain medication, recently had a seizure that caused him to fall and led to nerve damage and was in severe pain."  FAC, Doc. 6 at 7.  Arellano purportedly told Jones that he needed to go to the TTA but she denied his request and sent him back to his cell.  *See id.*  Arellano claims to have had a seizure "hours after their denial."  *Id.*

/ / /

---

[7] Beltran is not a Defendant in this matter.

Jones attests that she was "working third-watch shift (2:00 p.m. to 10:00 p.m.) on C-Yard in window three" passing medication to inmates on June 11, 2019. Jones Decl., Doc. 53-3 at ¶¶ 3, 5. On that date, Arellano was given his medication by LVN Bascal[8] at 8:17 p.m. *See* Doc. 53-7 at 190. Jones further attests that she does not "recall Mr. Arellano informing me of a medical emergency, requesting to be seen in the TTA, or even talking to me that day." Jones Decl., at ¶ 5.

On June 11, 2019, Defendant Licensed Vocational Nurse Sihotang was also working "third-watch shift (2:00 p.m. to 10:00 p.m.) on C-Yard in window four," Sihotang Decl., Doc. 53-4 at ¶ 5. Sihotang, like Jones, attests that she does "not recall Mr. Arellano informing me of a medical emergency, requesting to be seen in the TTA, or even talking to me that day." *Id.*

Both Jones and Sihotang declare that if Arellano believed he was being ignored by medical staff as to a medical need, he had the option to go "man down" which involves "either laying down or informing any staff member of a medical emergency." Jones Decl., at ¶ 6, Sihotang Decl. at ¶ 6. When this happens, "immediate staff trained in basic life support respond" and have the authority to send Arellano to a "higher level of care, like the TTA." *Id.* Neither Jones nor Sihotang would have the "ability to override" such a decision. *Id.*

There is no documentation that Arellano used the "man down" procedure that evening but he did use the procedure the following day on June 12, 2019. *See* Doc. 53-7 at 1264 (Assessment form dated June 12, 2019.) In this assessment, LVN Rochelle Johnson[9] notes that Arellano arrived at the TTA at 7:58 p.m. and reported an "unwitnessed seizure" that occurred the prior day. *Id.* LVN Johnson gave Plaintiff a "ketorolac injection for pain" and Dr. Silva[10] was contacted in order to be informed of Plaintiff's symptoms and

---

[8] Bascal is not a named Defendant in this action.
[9] Johnson is not a named Defendant in this action.
[10] Silva is not a named Defendant in this action.

15

complaints. *See id.* at 1206, 1264. Specifically, Dr. Silva was informed that Arellano claimed to have a seizure the night before and had "back [and] neck pain radiating to chest since last night." *Id.* at 1206 (Provider Telephone/Consultation Note dated June 12, 2019 at 8:25 p.m.) In the section on this form titled "clinical findings by informant to provider" it is noted that Arellano was "laughing [and] giggling in TTA" and there was no finding of "bruises or swelling" on Arellano's body. *Id.* Dr. Silva ordered Arellano to be sent back to his housing and to follow up with his PCP, Dr. Guldseth, in five days. *See id.*

On June 26, 2019, Arellano alleges that he told Jones that he woke up to a seizure with intense pain in his chest near his heart. *See* FAC at 7. He further alleges he informed Jones that Dr. Guldseth had previously told him to go to the "TTA to get a prolactin blood drawn right after a seizure." *Id.* However, Arellano maintains Jones told him to go back to his cell or "otherwise get a disciplinary action" rather than follow Dr. Guldseth's instructions. *Id.*

On that day, Jones attests that she was "working third-watch shift (2:00 p.m. to 10:00 p.m.) on C-Yard in window three." Jones Decl. at ¶ 9. Also, on that day Arellano received medication from Nurse Johnson at 4:02 p.m. *See* Doc. 53-7 at 173 (Medication Administration Record dated June 26, 2019.) Arellano went "man down" at approximately 4:20 p.m. and was transported to the TTA where he was examined by Dr. Zhang[11]. *See id.* at 1195-97 (Progress Notes dated June 26, 2019.) Dr. Zhang indicated that Arellano's "chief complaint" was that he gets "shooting pain in the back of [his] head" and "they're tapering my Gabapentin so I'm having more pain." *Id.* at 1197. Dr. Zhang determined that Arellano had "chronic neck pain" that had been "worsened by physical therapy today." *Id.* Dr. Zhang ordered x-rays and a ketorolac injection for pain and discharged him from the TTA at 5:07 p.m. *Id.* Arellano returned to his housing and claims that he told Jones around 6:40 p.m. that he had a seizure but she would not let him return to the TTA. *See* FAC at 8.

---

[11] Dr. Zhang is not a Defendant in this action.

Less than two hours later, Arellano received his evening medication from Nurse Johnson at 8:17 p.m. but does not allege that he asked her to go to the TTA. *See* Doc. 53-7 at 173 (Medication Administration dated June 26, 2019.)

On July 14, 2019, Arellano alleges that he was in the pill line when he told Defendant Nurse Santillan that his chest pain was "so severe it was interfering with [his] breathing" and he needed "immediate medical care" and requested to see a doctor to get "proper course of treatment for symptoms." FAC at 9. Defendant Santillan purportedly told Arellano that he was "bullshitting" and to "go away from his window." *Id.* Arellano claims he approached Officer Plaza[12] to seek medical attention, but Defendant Santillan told Officer Plaza Arellano was "bullshitting" and did not require medical attention. *Id.* Officer Plaza allegedly told Arellano to go back to his cell because "medical would not help [him]," and that he could do nothing other than send Plaintiff "back to [his] cell or get a disciplinary action." *Id.*

Arellano's medical records indicate that Defendant Santillan provided Arellano with medication at 3:47 p.m. that day. *See* Doc. 53-7 at 158 (Medication Administration Record dated July 14, 2019.) Santillan attests that he does not "recall Mr. Arellano requesting medical care on July 14, 2019." Santillan Decl. at ¶ 7. In his Opposition, Arellano claims that he suffered three hours of "intense pain" before he "manage[d] to go to TTA through another venue." Pl.'s Opp'n, Doc. 64 at 20. He further claims, "by the time I got to [the] TTA my pain had reduce[d]." *Id.* Arellano was seen at the TTA around 7:00 p.m. where he claimed that "his seizures started acting up when he was taken off his gabapentin." Doc. 57-3 at 1435 (Assessment records dated July 14, 2019.) Arellano also told Nurse Washburn[13] at 7:26 p.m. that his "pain comes and goes and that he currently doesn't have any pain." *Id.* at 1434. Nurse Washburn administered naproxen to Arellano and returned him to his housing with the direction to see his PCP within fourteen days. *See id.*

---

[12] Plaza is not a named Defendant in this action.

[13] Nurse Washburn is not a named Defendant in this action.

Defendant Santillan provided Arellano with his last medication of the day at 9:27 p.m. *See id.* at 158 (Medication Administration Record dated July 14, 2019.)

C.   Arguments

Dr. Martin first seeks summary judgment with respect to Arellano's Eighth Amendment inadequate medical care claims because evidence in the record demonstrates his medical decisions to deny his request for Gabapentin and the examination he conducted of Arellano's neck does not constitute deliberate indifference to a serious medical need. *See* Defs.' Mem. of P&As at 18-22. Specifically, Dr. Martin argues there is no genuine dispute with respect to any deliberate indifference on his part because his diagnosis of "possible malingering, and decision to return Arellano to his housing unit with naproxen, in addition to the Cymbalta and capsaicin cream he had already prescribed, was reasonable." *Id.* at 20.

Defendants Jones, Sihotang, and Santillan also seek summary judgment on the grounds that Arellano did not have an objectively serious medical need, there is no evidence of subjective deliberate indifference on the part of these Defendants, and Arellano has shown that no "additional harm was caused by his delayed access to the urgent care." *Id.* at 27-32.

All Defendants seek summary judgment with respect to Arellano's Bane Act cause of action on the grounds that without a violation of Arellano's constitutional right or "some other statutory right, there can be no cause of action under the Bane Act." *Id.* at 24, 33. In addition, Defendants seeks summary judgment as to all of Arellano's state law claims or in the alternative, they argue the Court should decline to exercise supplemental jurisdiction over the state law claims. *See id.* at 35.

Finally, all Defendants claim that because Arellano does not have a clearly established right to dictate any specific course of treatment, they are entitled to qualified immunity with respect to Arellano's Eighth Amendment claims for damages. *Id.* at 34-35.

/ / /

/ / /

D.     Discussion

1.     *Eighth Amendment Inadequate Medical Care Claims*

a.     *Standard of Review*

The government has an "obligation to provide medical care for those whom it is punishing by incarceration," and a failure to meet that obligation can violate the Eighth Amendment. *Estelle v. Gamble*, 429 U.S. 97, 103–05 (1976). In order to prevail on an Eighth Amendment claim for inadequate medical care, however, a prisoner must show "deliberate indifference" to his "serious medical needs." *Id.* at 104. This includes "both an objective standard—that the deprivation was serious enough to constitute cruel and unusual punishment—and a subjective standard—deliberate indifference." *Snow v. McDaniel*, 681 F.3d 978, 985 (9th Cir. 2012), *overruled in part on other grounds by Peralta v. Dillard*, 744 F.3d 1076 (9th Cir. 2014) (en banc).

To meet the Eighth Amendment's objective requirements, the prisoner must demonstrate the existence of a serious medical need. *Estelle*, 429 U.S. at 104. A sufficiently serious need exists if failure to treat his injury or condition "could result in further significant injury" or cause "the unnecessary and wanton infliction of pain." *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006) (internal quotation marks omitted) (citing *McGuckin v. Smith*, 974 F.2d 1050, 1059 (9th Cir. 1992), *overruled in part on other grounds by WMX Techs., Inc. v. Miller*, 104 F.3d 1133 (9th Cir. 1997) (en banc)).

To meet the Eighth Amendment's subjective requirement of deliberate indifference, a "high legal standard," a prisoner must demonstrate the defendant "kn[e]w[] of and disregard[ed] an excessive risk to [his] health and safety." *Toguchi v. Chung*, 391 F.3d 1051, 1057, 1060 (9th Cir. 2004) (internal quotation marks and citation omitted). This "requires more than ordinary lack of due care." *Farmer v. Brennan*, 511 U.S. 825, 835, (1994) (internal quotation marks omitted) (citing *Whitley v. Albers*, 475 U.S. 312, 319 (1986)). "[T]he official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* at 837. Deliberate indifference "may appear when prison officials deny, delay or

19

intentionally interfere with medical treatment, or it may be shown by the way in which prison physicians provide medical care." *Hutchinson v. United States*, 838 F.2d 390, 394 (9th Cir. 1988).

"In deciding whether there has been deliberate indifference to a prisoner's serious medical needs, [courts] need not defer to the judgment of prison doctors or administrators." *Hunt v. Dental Dep't*, 865 F.2d 198, 200 (9th Cir. 1989). However, "[a] difference of opinion between a physician and the prisoner—or between medical professionals— concerning what medical care is appropriate does not amount to deliberate indifference." *Snow*, 681 F.3d at 987 (citing *Sanchez v. Vild*, 891 F.2d 240, 242 (9th Cir. 1989)). Rather, "to prevail on a claim involving choices between alternative courses of treatment, a prisoner must show that the chosen course of treatment 'was medically unacceptable under the circumstances,' and was chosen 'in conscious disregard of an excessive risk to [the prisoner's] health.'" *Toguchi*, 391 F.3d at 1058 (quoting *Jackson v. McIntosh*, 90 F.3d 330, 332 (9th Cir. 1996), *overruled in part on other grounds by Peralta*, 744 F.3d at 1076)); *accord Gordon v. Cty. of Orange*, 6 F.4th 961, 970 (9th Cir. 2021).

### b.   Analysis

Based on the record before it, this Court finds no jury could reasonably conclude that any named Defendant acted with deliberate indifference to Arellano's claims of severe pain or his reported seizures.

### c.   Claims against Dr. Martin

Specifically, Arellano claims that when he informed Dr. Martin he had a seizure and was in pain, Dr. Martin called him a "liar" and "forcefully twisted" his neck "left and right," called him a "Mexican prisoner and a drug addict just like all the other ones," and said that "all [Arellano] wants is drugs." FAC at 4.

However, the undisputed evidence in the record shows Arellano has an extensive medical history dating back to 2011 of chronic neuropathic pain for which he was continually treated by prison doctors, nurses, psychologists, and neurologists before he was examined, on only one occasion, by Dr. Martin on June 5, 2019. As noted above, during

the same time frame that Arellano sought treatment from the Defendants in this matter, he was under the care of Dr. Guldseth, his primary care physician and was being treated by a neurologist, Dr. Malhotra.   In addition, Arellano's medical history, which has been documented in many of the cases Arellano has filed since 2015 and set forth above, shows that he was prescribed Depakote, Gabapentin, Cymbalta, acetaminophen, naproxen, capsaicin cream, along with several other medications and has undergone several diagnostic tests such as X-rays, a CT scan, and a nerve conduction study.   He was also referred to a neurologist multiple times and offered physical therapy, nursing appointments, and chronic pain appointments.

This Court has already found that the medications, including the tapering of Gabapentin, and overall course of treatment Dr. Guldseth provided to Arellano from January 2019 through October 2019 were medically appropriate under the circumstances[14]. The claims against Dr. Martin arise from the one examination he conducted on Arellano on June 5, 2019 which fell during the time that Arellano was being treated for his chronic pain issues and alleged seizures by Dr. Guldseth, his PCP.

Dr. Martin attests that Arellano told him that his "Gabapentin was tapered so it was 'an emergency.'"   Martin Decl. at ¶ 8.   He acknowledges that he "performed a physical exam which included but was not limited to inspection and palpation [of] Mr. Arellano's neck looking for signs of trauma, infection, or other concern."   *Id.*   He declares "it would have been [his] customary practice to test range of motion by turning his head left and right in order to assess the potential for injury," but at "no time did [he] intentionally cause Mr. Arellano pain."   *Id.*   Finally, he opines "it would not have been appropriate to deviate from Dr. Guldseth's plan of care by reinstating Arellano's Gabapentin prescription at an emergency medical appointment like the one on June 5, 2019."   *Id.* at ¶ 9.

/ / /

---

[14] *See Guldseth*, Doc. 74, Order Granting Motion for Summary Judgment at 20.

Arellano argues in his Opposition that there is no evidence in the record to support the claim that he was "specifically requesting Gabapentin." Pl.'s Opp'n at 2. However, there is ample evidence in the record that he was seeking Gabapentin on multiple occasions. On June 4, 2019, the day before Arellano was examined by Dr. Martin, Arellano noted that his Gabapentin had been discontinued the day before causing his pain to "be severe" and his seizures are only "control[led] by Gabapentin." Doc. 57-3 at 522 (Health Care Services Request Form dated June 4, 2019.) Arellano stated that the refusal to reinstate his Gabapentin was "putting [his] life in danger" and he would hold "liable whoever reads this and don't take proper steps (emergency) to be put where I was at on Gabapentin." *Id.* One day later, on the day Arellano was examined by Dr. Martin on June 5, 2019, he filed another grievance noting that he had gone to the TTA the day prior as well due to "severe pain" and "pain triggers [his] seizures." Doc. 57-3 at 521 (Health Care Services Request Form dated June 5, 2019.) Accordingly, Arellano demanded "so put me back on my meds" which he claims is Gabapentin as it is the only medication that "controls [his] seizures." *Id.*

Arellano does not dispute or object to any of the medical records submitted by Defendants nor does he dispute any of the numerous Health Care Services Request Forms submitted by him to prison officials. Arellano complained of neuropathic pain and seizures, and each time various medical personnel continued his prescription medication, sometimes prescribed different medication, sometimes increased dosages while other times decreasing dosages, as well as suggesting non medication type intervention or suggesting alternative pain medication based on Arellano's medical care record, mental health, and documented history of noncompliance with both his Gabapentin and Depakote prescriptions. While Arellano argues in his Opposition that Dr. Martin's refusal to reinstate his Gabapentin prescription and his examination of Arellano's neck which allegedly caused him pain was based on "personal bias decision of race," there is no evidence in the record to support this argument but there is overwhelming evidence that Arellano was seeking reinstatement of his Gabapentin.

/ / /

Moreover, while the record also shows Arellano's repeatedly insisted that only increased levels of Gabapentin were appropriate to treat both his pain and his seizures, Arellano is not a medical expert, and his unsupported lay opinion as to the efficacy or superiority of Gabapentin over any alternate medication is insufficient as a matter of law to establish a genuine factual dispute. *See Estelle*, 429 U.S. at 93 (stating that the question whether "additional diagnostic techniques or forms of treatment is indicated is a classic example of a matter for medical judgment"); *Toguchi*, 391 F.3d at 1058 (finding arguments that "Seroquel is superior to Triafon and therefore should not have been discontinued" insufficient to establish deliberate indifference); *see also Valdez v. Zhang*, No. 20-cv-0736-JLS-WVG, 2023 WL 2657626, at *7 (S.D. Cal. Mar. 27, 2023) (Plaintiff failing to "offer any evidence whatsoever that [his doctor's] clinical assessments and recommendations deviated from prevailing standards of care" defeats any finding of deliberate indifference to an "excessive risk to plaintiff's health."); *O'Brien v. Saha*, No. 19-CV-1957-JLS-JLB, 2021 WL 960693, at *6 (S.D. Cal. Mar. 15, 2021) (concluding that "no reasonable juror could find that Defendants were deliberately indifferent to Plaintiff's pain in tapering him off morphine and gabapentin and pursuing a variety of other pain treatment options over a period of many months."); *Peacock v. Horowitz,* No. 13-cv-2506-TLN-AC, 2016 WL 3940346, at *7 (E.D. Cal. July 21, 2016) ("While plaintiff is certainly free to refuse specific medications or types of medications, he does not have a right to dictate what medications he will be prescribed.")

Here, the medical records before the Court establish that treatment provided to Arellano on the one occasion he was treated by Dr. Martin was medically appropriate under the circumstances. *See Toguchi*, 391 F.3d at 1058; *Jackson*, 90 F.3d at 332. Arellano disagrees, but his lay opinion alone, unsupported by any "particular parts of materials in the record, including depositions, documents, . . . affidavits or declarations, stipulations, . . . admissions, interrogatory answers," or other admissible evidence which corroborates his conclusion or reasonably tends to show Dr. Martin chose any particular course of treatment with conscious disregard of his needs, is insufficient to establish a genuine dispute. FED.

23

R. Civ. P. 56(c)(1)(A); *Rivera v. Nat'l R.R. Passenger Corp.*, 331 F.3d 1074, 1078 (9th Cir. 2003) ("Conclusory allegations unsupported by factual data cannot defeat summary judgment."); *Schultz v. Leighton*, 325 F. Supp. 3d 1069, 1077–78 (N.D. Cal. 2017) (finding prisoner failed to "show any unmet medical need, much less deliberate indifference" and granting summary judgment where prisoner's "claim of a need for morphine, or any treatment other than the treatment he received, [wa]s based entirely on self-diagnosis and [without] medical support.").

For these reasons, the Court holds that Dr. Martin is entitled to summary judgment with respect to Arellano's Eighth Amendment inadequate medical care claims.

### d.   Claims against Jones, Sihotang, and Santillan

Arellano is seeking to hold Defendants Jones, Sihotang, and Santillan, all LVNS, held liable for allegedly denying him access to the TTA on June 11, June 26, and July 14 in 2019.  These Defendants move for summary judgment on the grounds that there is no evidence that Arellano had a serious medical need, they did not act with deliberate indifference, "no additional injury was caused by the alleged delay in access the urgent care, and Arellano had ample access to medical care at all times."  Defs.' Memo of P&As at 27.

To meet the Eighth Amendment's objective requirements, the prisoner must demonstrate the existence of a serious medical need.  *Estelle*, 429 U.S. at 104. A sufficiently serious need exists if failure to treat his injury or condition "could result in further significant injury" or cause "the unnecessary and wanton infliction of pain." *Jett*, 439 F.3d at 1096.  These Defendants argue that on the dates in question, Arellano was "ambulating normally, had no outward appearance of pain, had physical exams both before and after the incidents that were normal, [and] was receiving a comprehensive course of treatment supervised by his treating physician Dr. Guldseth and neurologist Dr. Malhotra." Defs. Memo P&As at 27.

The first date that is the subject of this litigation relating to these Defendants involve the events that occurred on June 11, 2019.  On that date, Arellano was seen at the TTA at

11:46 a.m. where he was examined by LVN Beltran who noted that his physical exam was normal and he "ambulated to clinic with steady brisk gait with no difficulty, facial grimacing, or guarding."  Doc. 53-7 at 1497-1512.  LVN Beltran prescribed capsaicin cream and acetaminophen and discharged him at 12:25 p.m.  *See id.*  On this date, the record is undisputed that Arellano received his medication from LVN Bascal at 8:17 p.m. but had no documented medical complaints at that time.  *See* Doc. 53-7 at 2220.  Arellano alleges that approximately forty-five minutes later, he told Sihotang that he was in "severe pain" but Sihotang refused to allow him to go to the TTA.  FAC at 7.  He claims to have suffered a seizure hours later but there is no evidence in the record to support that claim.

Instead, Arellano went to the TTA the following day where the nurse on duty reported to Doctor Silva that Arellano was "laughing [and] giggling" and there was no "signs of injury" to Arellano.  Doc. 53-7 at 1206.  Arellano was returned to his housing. *See id.*  In his Opposition, Arellano points to no evidence in the record that he suffered from a serious medical need when he allegedly told Defendant Sihotang that he needed to go to the TTA on June 11, 2019 and thus, has not met the objective requirements to find an Eighth Amendment violation.

The second day that is the subject of this litigation are the events that occurred on June 26, 2019.  In his FAC, Arellano alleges that he told Defendant Jones on June 26, 2019 that he had woken up that day to a seizure with intense pain in his chest near his heart.  *See* FAC at 7.  He also claims to have told Jones that Dr. Guldseth had previously told him to go to the "TTA to get a prolactin blood drawn right after a seizure."  *Id.*  However, Arellano claims Jones told him to go back to his cell or "otherwise get a disciplinary action" rather than follow Dr. Guldseth's instructions.  *Id.*

However, the record actually reflects that Arellano was seen at the TTA at 11:02 a.m. on June 26, 2019 even though he claims he was denied access by Defendant Jones. *See* Doc. 53-7 at 1461.  Arellano was examined by Nurse Beltran who found Arellano "presented to clinic ambulating with a brisk steady gait with no limping, no difficulty, no

facial grimacing, or guarding" while he was also "smiling, laughing, [and] telling jokes." *Id.* at 1464.

Jones was not working that morning, instead he was working the "third-watch shift" which was from 2:00 p.m. to 10:00 p.m. Jones Decl. at ¶ 9. Arellano did call "man down" again that day and was transported back to the TTA at 4:20 p.m. *See* Doc. 53-7 at 1195-1197. Dr. Zhang[15] noted in the medical record that Arellano "appeared in no pain and moved his neck freely as he walked out of [the] TTA" when he was discharged at 5:07 p.m.

Arellano appears to claim in his Opposition that his interaction with Jones occurred approximately one hour later when he "had a seizure at 6:20 p.m." but Jones purportedly denied his request to return to the TTA for the third time that day. However, Arellano also received medication from LVN Johnson later that evening at 8:17 p.m. but does not appear to have sought any additional medical attention for his claimed seizure. *See* Doc. 53-7 at 171. Based on the undisputed evidence in the record, neither Jones, nor any other RJD medical personnel, were deliberately indifferent to any of his serious medical needs on June 26, 2019.

The third day that is the subject of this litigation are the events that occurred on July 14, 2019. On July 14, 2019, Arellano alleges he was in the pill line when he told Defendant Santillan that his chest pain was "so severe that it was interfering with [his] breathing" and he needed "immediate medical care" and requested to see a doctor to get "proper course of treatment for symptoms." FAC at 9. However, he claims Santillan told him he was "bullshitting" and "to go away from his window." *Id.*

The record shows that Santillan administered medicine to Arellano on this day at 3:47 p.m. *See* Doc. 53-7 at 158. At 6:55 p.m., just three hours later, Arellano did go to the TTA where he was seen by Nurse Washburn. *See id.* at 1435-1446. Arellano claimed again that he was having seizures due to the discontinuation of Gabapentin. *See id.* at 1446.

---

[15] Dr. Zhang is not a named Defendant.

However, Nurse Washburn found that his vitals were normal and provided him with naproxen.  Arellano was discharged at 7:15 p.m. with instructions to follow up with his PCP in fourteen days.  *See id.*  Santillan gave Arellano his last dose of medication for the day at 9:47 p.m.  *See* Santillan Decl. at ¶ 5.  The following day, Arellano had an appointment with Nurse Beltran who found his vitals and physical exam to be normal.  *See* Doc. 53-7 at 1422.

Arellano's sole response to Santillan's showing that Arellano was provided medical care on that day, and the following day, is his claim "Santillan not doing nothing when I claim man down with chest pain is deliberate indifference."  Pl.'s Opp'n. at 5.  However, Arellano points to no evidence in the record to dispute Santillan's showing that there was no deliberate indifference to Arellano's serious medical needs on July 14, 2019.

Based on this record, and even drawing all facts and inferences in Arellano's favor, the Court finds no jury could find Defendant Dr. Martin's course of care and treatment decisions, or that the actions taken by Defendants Sihotang, Santillan, and Jones, were deliberately indifferent to Arellano's medical needs.  Accordingly, the Court GRANTS Defendants Martin, Sihotang, Santillan, and Jones' Motion for Summary Judgment as to Arellano's Eighth Amendment claims.

### e.  *Qualified Immunity*

Finally, Defendants claim that they are entitled to qualified immunity with respect to Arellano's Eighth Amendment claims.  *See* Defs.' P&As at 34-35.

On summary judgment, courts generally resolve questions of qualified immunity through a two-pronged inquiry.  *Tolan v. Cotton*, 572 U.S. 650, 655 (2014).  The first prong "asks whether the facts, '[t]aken in light most favorable to the party asserting the injury, . . . show the officer's conduct violated a [federal] right[.]'"  *Id.* (quoting *Saucier v. Katz*, 533 U.S. 194, 201 (2001)).  The second prong "asks whether the right in question was 'clearly established' at the time of the violation."  *Tolan*, 572 U.S. at 656 (quoting *Hope v. Pelzer*, 536 U.S. 730, 739 (2002)); *see also Sharp v. Cnty. of Orange*, 871 F.3d 901, 909 (9th Cir. 2016).  The court is not required to address the prongs in any particular order.  *See*

Pearson v. Callahan, 555 U.S. 223, 236 (2009) ("[T]he judges of the district courts and the courts of appeals should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand.").

However, where, as is the case here with respect to Arellano's Eighth Amendment claims, "no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity." *Saucier*, 533 U.S. at 201; *County of Sacramento v. Lewis*, 523 U.S. 833, 841 n.5 (1998) ("[The better approach to resolving cases in which the defense of qualified immunity is raised is to determine first whether the Arellano has alleged the deprivation of a constitutional right at all."). Because the Court has found no genuine dispute with regard to Arellano's Eighth Amendment deliberate indifference to serious medical needs against Defendants, it need not also decide whether they would be entitled to qualified immunity.

**IV.   Sua Sponte Dismissal Fourteenth Amendment Equal Protection claims**

In the May 24, 2021, Order Granting in part, and Denying in part, Defendants' Motion to Dismiss, the Court indicated that "this matter will proceed with an equal protection claim under the Fourteenth Amendment against Defendant Dr. Martin." Doc. 30 at 9. While Defendant Dr. Martin does not address this claim in the pending Motion for Summary Judgment, the Court finds that *sua sponte* dismissal of this claim pursuant to 28 U.S.C. § 1915(e)(2) and § 1915A is appropriate.

In his FAC, Arellano alleges that Dr. Martin called him a "Mexican prisoner and a drug addict just like all the other ones," and said that "all [Arellano] wants is drugs." FAC at 4.

The Equal Protection Clause of the Fourteenth Amendment "is essentially a direction that all persons similarly situated should be treated alike." *See City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985); *see also Vacco v. Quill*, 521 U.S. 793, 799, (1997) (citing *Plyler v. Doe*, 457 U.S. 202, 216 (1982) and *Tigner v. Texas*, 310 U.S. 141, 147 (1940); *Fraley v. Bureau of Prisons*, 1 F.3d 924, 926 (9th Cir. 1993) (per

28

curiam).  To establish an equal protection violation, Plaintiff must demonstrate "that the [challenged action], either on its face or in the manner of its enforcement, results in members of a certain group being treated differently from other persons based on membership in that group." *McLean v. Crabtree*, 173 F.3d 1176, 1185 (9th Cir. 1999). "Second, if it is demonstrated that a cognizable class is treated differently, the court must analyze under the appropriate level of scrutiny whether the distinction made between the two groups is justified." *Id*. (citation and quotations omitted).  If the aggrieved party is a member of a protected or suspect class, or otherwise suffers the unequal burdening of a fundamental right, the court applies strict scrutiny. *City of Cleburne*, 473 U.S. at 439-40. "Government actions that do not . . . involve suspect classifications will be upheld if [they] are rationally related to a legitimate state interest." *Fields v. Palmdale Sch. Dist.*, 427 F.3d 1197, 1208 (9th Cir. 2005).

"Intentional discrimination means that a defendant acted at least in part because of a plaintiff's protected status." *Serrano v. Francis*, 345 F.3d 1071, 1082 (9th Cir. 2003) (emphasis in original) (quoting *Maynard v. City of San Jose*, 37 F.3d 1396, 1404 (9th Cir. 1994)).

While Arellano claims in his Opposition that Dr. Martin "refused to give me anything because I was Mexican," the evidence in the record shows that Dr. Martin was following Arellano's PCP's decision to taper his Gabapentin.  *See* Pl.'s Oppn., Doc. 64 at 6, Doc. 53-7 at 1198-1199 (Progress Notes dated June 5, 2019.)  The medical records before Dr. Martin when he treated Arellano on that date show that Arellano's "active" medications included, but were not limited to, acetaminophen, capsaicin, Gabapentin," and anxiety medication.  *See* Doc. 53-7 at 1198.  Dr. Martin also told Arellano to follow up with his PCP.  *See id.*  Here, based on the entire record, the Court could only find that Arellano's claims that Dr. Martin "refused to give [him] anything" are based on Arellano's belief that Dr. Martin should have increased his Gabapentin dosage.

"The standard for determining whether a plaintiff has failed to state a claim upon which relief can be granted under § 1915(e)(2)(B)(ii) is the same as the Federal Rule of

Civil Procedure 12(b)(6) standard for failure to state a claim." *Watison v. Carter*, 668 F.3d 1108, 1112 (9th Cir. 2012); *see also Wilhelm v. Rotman*, 680 F.3d 1113, 1121 (9th Cir. 2012) (noting that § 1915A screening "incorporates the familiar standard applied in the contest of failure to state a claim under Federal Rule of Civil Procedure 12(b)(6)"). Rule 12(b)(6) requires a complaint to "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

Here, the undisputed evidence in the record indicates that Dr. Martin deferred to the treatment plan established by Arellano's PCP who had been treating him for several months and Arellano's claim he was denied treatment because of his ethnicity is not plausible. *Iqbal,* 556 U.S. at 678. Accordingly, the Court *sua sponte* DISMISSES Arellano's Fourteenth Amendment equal protection claims pursuant to 28 U.S.C. § 1915(e)(2) and § 1915A without leave to amend as the Court finds that amendment would be futile.

## V.   State Law Claims

To the extent that Arellano is seeking to bring claims under California state law, the Court declines to exercise supplemental jurisdiction over these pendent state claims because there are no remaining federal claims in this action. *See* 28 U.S.C. § 1367(c)(3) ("The district court may decline to exercise supplemental jurisdiction over a claim under subsection (a) if . . . the district court has dismissed all claims over which it has original jurisdiction."); *United Mine Workers of America v. Gibbs*, 383 U.S. 715, 726 (1966) ("if the federal claims are dismissed before trial, . . . the state claims should be dismissed as well."); *Acri v. Varian Assoc.*, Inc., 114 F.3d 999, 1000 (9th Cir. 1997) ("[O]nce judicial power exists under § 1367(a), retention of supplemental jurisdiction over state law claims under 1367(c) is discretionary.").

## VI.   Conclusion and Order

For all the reasons discussed, the Court:

(1) **GRANTS** Defendants Motion for Summary Judgment pursuant to Fed. R. Civ. P. 56 (Doc. 53); (2) **DISMISSES** Plaintiff's Fourteenth Amendment equal protection

claims pursuant to 28 U.S.C. § 1915(e)(2) and § 1915A without leave to amend; (3) **DECLINES** to exercise supplemental jurisdiction over Plaintiff's state law claims and **DIRECTS** the Clerk of the Court to enter a final judgment in favor of Defendants on all claims and to close the file.

      **IT IS SO ORDERED**.

DATE:  June 28, 2023

HON. RUTH BERMUDEZ MONTENEGRO
UNITED STATES DISTRICT JUDGE